Good morning. My name is Dave O'Brien. I'm here representing Shannon Peters. This case has to do with giving this opportunity, giving this court the opportunity to reaffirm its holding in Jones v. Edwards regarding strip-searching pre-trial detainees who are not going to be their crime has been reviewed by a magistrate. These are simple misdemeanor crimes or less. My intent here today is to convince you to reverse the district court that felt that the Supreme Court decision in Florence v. Board of Chosen Freeholders reversed Jones v. Edwards. And I think a fair reading of Jones v. Edwards is that it did not reverse it. The district court held that reasonable suspicion is not required to strip-search detainees subject to possible but as not yet fully defined exceptions. And the court made a distinction which I'm not sure I completely understand because the court agreed with Peters that the holding in not going to be placed into the general jail population. But the court drew a distinction between the holding in Florence and the rule that was announced in Florence. And I'm not really sure how to explain that other than to just quote what the court said which was the legal rule, not the holding, the rule overrules the prior circuit legal rule that adult detainees cannot be searched without reasonable suspicion regardless of circumstances. Now I think district court made this erroneous conclusion by committing one legal error and two factual errors. The legal error was applying Florence in a situation where the very majority in Florence, the concurring opinions in Florence and the dissenting opinions in Florence all said it did not apply to pretrial detainees who haven't had their cases reviewed by a magistrate, who the general jail population. We have to keep in mind the general rule and the reason for it. We understand that jails have to provide security and they have to keep contraband from getting into the jail. And we understand that people might intentionally try to get arrested or take an opportunity to convey contraband into a jail. But as this court previously held in Jones v. Peters, that has nothing to do with this case. I mean this case, the jailers have a duty to protect detainees from themselves. True. What they don't... And if Correction Officer Risdall or Jailer Risdall had not done what she did but had said okay I'm leaving and shut the door and Ms. Peters had hung herself in the next 20 minutes, you would be suing on behalf of her estate for failure to protect. Now that it seems to me has to be translated into the governing standard here. Well it would. And I think it's easy. You simply have an appropriate suspicion test. Any person who is brought in for booking and about to be detained, put into the custody of people who will then have a duty to protect, who refuses to answer routine suicide questions and refuses to surrender personal belongings that might be used to commit suicide, has given reasonable suspicion to do what was done here. And what's wrong with that as a legal standard? The legal standards sound fine. The problem is it doesn't comport with the facts of this case. Well you need to go back and review the record judge because... You need to review the record judge. Ms. Peters was asked, are you going to hurt yourself? And she responded, why the fuck would I want to hurt myself? She didn't refuse to answer anything. If you look at the video, she was upset. They were asking her questions. She wasn't responding. They said, that's it. This is over. They took her back. While they're walking her back, she starts to calm down. They get her into the jail cell. They bring an orange jumpsuit in, which she should be able to put on in private. The only reason, the only justification for forcing her to change clothes while they watch her is because she might be suicidal, right? They didn't think she was suicidal. They brought an orange jumpsuit in. They threw the orange jumpsuit. And that sounds like all the cases about whether the person was a threat to officer safety. And the defense lawyer always says, well, the officer wasn't scared. So it can't have been Fourth Amendment reasonable. But she did tell them, I'm not going to hurt myself. And they refused to accept that. It doesn't matter. It doesn't matter if she says, I'm not going to hurt myself, even though that's the reason they gave for the fact that they had to watch her take her clothes off. Listen, what happened here is these defendants wanted to embarrass and humiliate her because she was not fully cooperating with them. They had under their policy and under the Fourth Amendment, no right whatsoever to watch her take her clothes off. She didn't even need to take her clothes off under the policy in effect at the Woodbury County Jail at the time. They forced her to do that, to embarrass her because she was being belligerent. And you don't have to look any farther than the record than look at their reports, Judge. Their initial report says when she came into the jail, she's not suicidal. She's not doing anything wrong. We walk her back. They beat her, strip her naked, leave her in the cell with a paper jumpsuit, go back out and change the order, change their records. Do they change it to say we had to do what she did because she was suicidal? No, they change it and actually told the truth. We did what we did because she was belligerent. That's what the record says after they did this to her. We did it because she was belligerent. It doesn't say suicidal inmate, paper suit. It says belligerent inmate, paper suit. What do you contend the, I wouldn't want to hurt myself, response came from? I mean, was there an inquiry of her that brought that on? Yes. As a matter of fact, if, and if you look at this case, my reading, my reading of the briefs, your client denied that this remark came as a response to any question. Is that, is that, did I just misread that? I think she did, but there is a dispute as to exactly what the timing was in terms of asking the question the second time when they were back in the holding cell versus asking the question when they were out at the, out at the front desk when they first decided she's just too upset and we walked her back to holding. What's clear is they told her to put the jumpsuit on first, the orange jumpsuit, not the paper suit. She, she didn't want to do that. Only after they ordered her to put the jumpsuit on, did they ask her the suicide question again? And this is right in their reports. Did they, did they ask her the suicide question? One of the officers came back and asked her the suicide question. That's right. And she had not because she didn't identify that in her report. So at that point in time, she does give her the suicide question and all the officers testified that her response was, why the fuck would I want to hurt myself? Which they all admitted in their questions when she said that. Yes. And they all admit in their depositions that that's a negative response. I asked each of them, look, if I ask you, uh, sitting here, you want to go out and have a beer with me, uh, after we're done with this deposition? And you say, why would I want to do that? Uh, that's a negative response, isn't it? And they all said, yes. And I said, and if you say, why the F would I want to do that? That's a pretty emphatic negative response, isn't it? And they all agreed that yes, it was. But somehow the fact that she emphatically responded no to the suicide question was turned around by, uh, to, uh, as evidence that she was screaming and acting out quite profusely before that. Hadn't she, or did it have read the record on that? Well, she's upset. She's, she's been arrested. She's had a day with her kids. It's Sunday afternoon. She happens to be with a boyfriend. She thinks the boyfriend, she had a restraining order against him. She thinks it's been lifted. It hasn't. She's upset, but she's not acting out. She's not physically aggressive. She's crying. She does scream at one look, we're just going to take her back to the room, which they do ask her the suicide questions again, which they do as we already talked about. And only at that point, uh, that's when she says, why would I want to hurt myself? I don't want to hurt myself. I don't want to be here, but I don't want to hurt myself. She was emphatic about, and the judge in this district court and judge Loken, please read his decision. He specifically says that a factual issue has been generated as to on, on her statements. Why the F would I want to hurt myself as a negative response. And he specifically says that a factual issue has been generated as to whether or not they were right to have a strip search of her because they believed she reasonably was going to hurt herself. But he goes on to find, even though he sets out those factual, uh, disputes, he goes on to fight as a, to find as a matter of law, uh, that she in fact was suicidal and that they were justified in treating that solely for the reason because they believed she was suicidal, which again, all you do is look at their records, their records, and you can determine that that's not the case. They never saw her as suicidal. They never identified her as suicidal. The first time they identified her as suicidal was in their depositions. They identified her as belligerent and they put a paper suit on because they knew they couldn't stand there and watch under their own policy. And under the fourth amendment, they couldn't stand there and watch her take her clothes off unless she was suicidal or unless they had reasonable suspicion to believe that she was contraband or a weapon. And they all agreed that she was not, that they didn't have any suspicion to believe that she was concealing contraband or a weapon. So this, the Florence case and Jones v. Edwards has everything to do with this case. It is the policy of this, of this district that people that are not going to be put into the general jail population should not be subject to such a humiliating search. And this person was subjected to the humiliating search and she objected to it. That's what started this all. She very, she calmly said, look, she's standing there saying, I don't want to take my clothes off in front of you. And I don't want to take my clothes off with these two guys standing out in the hallway watching. Now they deny that they were standing out in the hallway watching, but the video shows clearly they are. Now wait a minute, if she had said, if she had not refused to have Ms. Rizdahl watch, you think, you think that the two men would have stayed, stayed there? Well, I don't know. If she wasn't aggressively resisting the female correction officer? This is before any aggression they come in and say, take your clothes off. And she goes, I don't want to with these men standing there. He went back in the cell because he thought she was being, after she was becoming more adamant about refusing to take her clothes off. If she had allowed, if she had disrobed in front of the female correctional officers, you think the male, the men would have stayed there? Based on my history of eight cases against this jail facility, I absolutely believe that. Yes. I believe they would have stayed and watched. And I believe she was right in objecting. And I believe they would have, they would not have followed with her objection. And she just would have had to continue to disrobe in front of the two males that were standing out in the hallway watching her. Yes, she was. Yes, she was under the fourth amendment and under Jones v. Edwards. There was no reason to make her take her clothes off at all. And it was being done to retaliate against her for her exercising her free speech and for being less than fully cooperative. How's that? Well, there are, there are various, the whole question of what, what is a strip search? What, what intrusion, the balancing, the intrusions. All right. We're, we're now, we're now to the point where we have a policy at the jail that, that, uh, a, a female person who will rate gives any indication of needing, well, has to put a jumpsuit on with a female correctional officer watching. That's not even their policy though. You look at the policies are in the appendix and they don't have to watch them. Fourth amendment. That's not a violation of the fourth amendment. Yes, it is under Florence and under Jones v. Edwards. If you're not being put into the general jail population, it absolutely is a fourth amendment. Now you guys can reverse that if you want to, but at least make it clear. Actually, I'm not sure that this panel can reverse Jones v. Edwards. I think it would take an end bonk to do that. Uh, but you can sure make known your wishes. I'd like to reserve the rest of my time. May it please the court. Um, Mr. Brian, my name is Alison Dirksen and I am here today on behalf of the Appleys, Michelle Rizdal, Lee Blanchard, Jonathan Hatfield, and Carlos Utsero. I think this case is pretty easy for this court to actually decide based on procedural grounds. Um, the procedural background of this case is important. Peters, um, complaint in jury demand alleged causes of action under 42 U.S.C. 1983 for violations of her first and fourth amendment rights and her rights under the Iowa constitution. The defendants filed motions for summary judgment as to all claims. And, um, the honorable Mark Bennett granted the individual officer's motions for summary judgment in part. Judge Bennett denied the officer's motions for summary judgment as to the Peters excessive force and free speech claim. Um, but granted the motions as to Peter's fourth amendment violation and privacy rights claim on two grounds, each ground being one of the elements of qualified immunity. Um, first judge Bennett held that there was no of Peter's fourth amendment privacy rights as a matter of law. And second, um, under the second element of qualified immunity, uh, judge Bennett granted summary judgment on independent grounds that at the time of the incident on May 27, 2012, it was not sufficiently clear that a reasonable officer should have allowed Peters to remain in a cell with articles of clothing that she could have used to harm herself or that an officer could not forcibly require her to change her clothes when she refused to change voluntarily. What if Jones changed that, uh, was he right given Jones or is this simply a bell balancing? I think it's simply a bell balancing test. Um, as, uh, judge Coleton recently said in, um, Jacobson v. McCormick, um, you know, he, you discussed that, that Jones case. And I think it's clear from that case that, um, Jones does not provide clarity for all searches of detainees absent reasonable suspicion for weapons and contraband, contraband. But, um, but in that case, the facts were very dissimilar than here, uh, in Jones, the jailers there performed a non-contact visual strip search of Jones consisting of stopping Jones in an alcove of a hallway where he was nude and then visually inspecting his private areas. Um, in this case, those facts didn't happen. And so I think the way to look at Jones is, especially under looking at qualified immunity, you know, does Jones provide clarity for this case? And I think, um, it provides one example of where a search was not deemed reasonable, but in this case, reasonable police officer reading Jones and applying these facts to it would not have thought that they were violating the fourth amendment or anything like that. Is that your position? That's, that's our position, your honor. Yeah. So I think the key procedural issues that this case can also be decided on without getting into the facts of whether, uh, the search was reasonable or not is that, and the most important of these procedural issues is that I think the appellant has waived the issue of the second element of qualified immunity by never bringing it up in his, in the brief. Um, in fact, she never mentioned qualified immunity in her brief at all. And under the summary judgment ruling, Judge Bennett granted summary judgment onto both elements of qualified immunity. Namely one, there was no violation of fourth amendment. And second, at the time of the incident, it was not, wouldn't have been clear to a reasonable officer that what they did was a violation of the constitution or the fourth amendment. Excuse me. Let me ask you this. Judge Bennett says that there's nothing in the record that undermines officer Rizdal's testimony that where a detainee refuses to answer the suicide questions, the detainee must be treated as potential for self harm and that the street clothing must be removed. I think that was kind of the crux of his ruling on the fourth amendment. Now, Mr. O'Brien says, well, she didn't refuse to answer the questions. She actually gave what the, uh, what he says any reasonable person would construe as a negative response. Is that, how do you reconcile the two? Well, I think it, I think it, you need to look at the totality of the circumstances and, um, based on her behavior prior to that comment and then her behavior after that comment, a reasonable officer, and it's a objective test, not a subjective test. A reasonable officer looking at all of those would view her as a potential threat of self harm. Um, the evidence is that she did before and after the comment that you would, she had the booking counter. She was very emotional, emotional. She admitted that she was crying. Um, she was screaming expletives, um, at the booking counter because of that, the booking process had to be terminated. She was taken back to the holding cell where she was given an opportunity to change, um, and was asked the suicide questions as, uh, you just went through with Mr. O'Brien. Uh, she refused to do that. She continued to scream enough service doll. She admits that, uh, it is admitted by the appellant that when officer Blanchard looks into the cell again, she is standing aggressively toward Ms. Riz doll. Uh, she then, uh, acts aggressively out towards officer Blanchard and screams that expletive, which is, you may deem it may be, you mean the, why would I want to? Yes. Why would I want to F, um, hurt myself? Why the F would I want to hurt myself? And I think, uh, Mr. O'Brien's point of comparing that to saying why the F would I want to go get a beer is a lot different than this situation given the, the facts of leading up to and after that expletive, which is an inappropriate response to those questions. You're saying a reasonable officer could still view that as a non-response that's correct. And I think giving deference to jail authorities, especially under, you know, the Supreme court just went through all of those reasons of why we need to give deference to jailers in Florence that, you know, I think precautions have to be taken and you can't just assume that she, by giving that expletive response that she would not harm herself. It's reasonable to take a wait and see approach your honor to see if she would, or at least you're saying it's reasonable not to take away. That's correct. That's correct. What's our standard of review of judge Bennett's factual determinations here that led up to his decision? Is it clearly erroneous or de novo or what? That's one of the procedural questions that we point out in our how did the appellant plead this appeal? And she states that this appeals and appeal from the district court's denial of her motion for new trial, not from the district court summary judgment ruling. And if it's an appeal from the, her motion for new trial ruling, then that is an abuse of discretion standard versus de novo. And so I think, you know, it is true that judge Bennett in denying the motion for new trial pointed to his summary judgment ruling. So the question is how to. Yes, sir. So if the fourth amendment ruling was wrong as a matter of law, the summary judgment ruling, that isn't that the procedural posture that the plaintiff is urging? And I think, I think your honor, because it's a, it's an odd situation because judge Bennett did refer to the summary judgment ruling in denying the motion for new trial. But I think you still give deference to the findings of fact because it's a really an appeal for the motion for new trial. So you give deference to the findings of fact by judge Bennett in the summary judgment ruling. It strikes me that you can, you can't appeal the, you can't appeal the summary judgment order. And so you have to wait till there's a final order. And appealing the, appealing the summary judgment order at this point in time, if it's wrong, means there has to be a trial of that issue. And I think that. So, you know, you, so you raise it as almost an abundance of caution. You raise it as a new trial motion, all the while intending to appeal. I don't understand why that's, what's wrong with that tactic. And I think if, if the appellant had said he was appealing, she was appealing. That's the standard review. It's the, it's the qualified. Actually, the tricky part is the standard review on qualified immunity appeals. And I think you're right, your honor. It's just an unusual situation where the Ms. Peters did not say that she was appealing the motion, the summary judgment ruling. But I read the notice of appeal. It's incorporated. It's included. I think explicitly. It is, but then, yes, your honor, she does list it in her notice of appeal. But then in her brief, if you look at where she sets forth the issues on appeal, she does not list the motion for summary judgment ruling as one of the rulings that she is appealing. Just solely the motion for new trial ruling. So. But that ruling explicitly said my grant of summary judgment was correct, right? That's correct, your honor. Now, on the, did the complaint, do you recall that the complaint's official capacity claims include a prayer for equitable relief? I don't believe so, your honor. Because then, then qualified immunity wouldn't have ended the case. And I, I, I, I guess I can't say for sure, your honor. I don't know if that, the answer to that question. I, I believe it was just money damages. But it is, it is stated as, as it's pled as an official as well as individual. That's correct, your honor, but. There doesn't appear to be an institutional defendant. The institution, the, the institutional defendant was dismissed based on Linnell in summary judgment. And there was no appeal of that. And there was no appeal of that. And we did not represent the institution, the county. Was that before this, this summary judgment? It was at the same time, your honor. So. Then it wasn't a qualified immunity summary judgment. The, the. Because qualified immunity doesn't, doesn't eliminate the possibility of Linnell liability. And, and I don't know the answer to that, your honor. I'm pretty sure I do. Okay. But. That's the problem. And actually a lot of, that's a, a stitch that slipped a lot in, in summary judgment practice. But if the only reason the individual defendants are, get off, so to speak, is qualified immunity, that means they may still have been liable. In which case there's potential for Linnell liability. Now I, I haven't studied, I haven't read the Linnell order, so I don't know how the trial court addressed that. Certainly it's summary judgment order reads like it was the first problem, the no violation problem of qualified immunity. And then the judge, and then Judge Bennett went on to find, yes, that there was no, that the law was not clearly established. And I think. There's no appeal. I think that's a good argument as far as how it plays out with deficient capacity claims. Linnell ruling, of course the Linnell ruling is not an appeal. Yeah. That's correct, your honor. That's not an issue here. I, and I think going back to the other procedural issue that I think is fatal to this appeal is, is the procedural issue of, did the, can this decision of the district court be affirmed based on the Judge Bennett's decision that the law was not clearly established? And I think that it can because I don't think the appellant here raised that issue in her opening is deemed a waiver and they can't later on raise that issue in the reply brief. So even under the most generous of readings, I don't think that the opening brief of the appellant here can be shown to argue that the law was not clearly established. There are no from this district or the, um, uh, or, or, uh, other districts that show that the law was so clearly established that that, uh, decision should be reversed by Judge Bennett. So your position is law was clearly established, has been decided and not appeal. That's correct, your honor. That is, that is our position. Um, based on, uh, even a generous review of the appellant's brief, we were dealing with qualified immunity here. That's correct. And unless there are any further questions, your honor, I think we are dealing with qualified immunity. That's correct, your honor. That the denial is what can be interlocutorily appealed. It just hangs in the background until there's a final order. That's correct. And I think, um, you know, in Jacobson v. McCormick, which this court just decided in August, uh, you, you decided that decision based on the clearly established element of qualified immunity. Thank you, your honor. Mr. O'Brien have some time. How much? I have a very short time and I have a really only one thing I want to say, two things actually. One is, uh, I, I understand that I didn't use the language that the defendants wanted me to in terms of writing my brief, but I don't think that's a requirement. Clearly our position was, uh, that Jones v. Edwards at the time in 1985, when it was first issued, found, uh, that the established in the 30 years since, uh, that you don't have qualified immunity if you strip search, uh, a person accused of a minor criminal offense, who's not being placed in the general jail population. That's open again after Florence, because Florence says we don't decide whether you may conduct the search of a person who won't be exposed to the general population. That's not a statement that it would be unconstitutional. True, but it cites the eight cases before Florence that said exactly that and doesn't overturn them. And it cites the two cases afterwards that say precisely that, uh, it cites them for support of its decision in Florence, but those cases are both going to the general jail population. So every circuit court that's reviewed this, 10 of them have said not when they're, unless they're going to the general jail population and judge Loken. The last thing I say is that if you want to reverse Jones v. Edwards, you can do that, but you need to understand that in Jones, the defendant was just as defiant, just as belligerent, just as upset. So if the rule is that if a person's upset during the booking process, we get to strip search them, uh, then you do need to reverse Jones v. Edwards in order to say that. Agreed. Thank you so much, judge. Well, I'm glad to hear that. I don't know. You may think so. I don't know. Or the other side may think we should have. Well, counsel, the case has been, uh,